# SUPREME COURT OF THE UNITED STATES

STACEY A. KINCAID, SHERIFF, FAIRFAX COUNTY, VIRGINIA *v.* KESHA T. WILLIAMS

ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. 22–633.   Decided June 30, 2023

The petition for a writ of certiorari is denied.

JUSTICE ALITO, with whom JUSTICE THOMAS joins, dissenting from the denial of certiorari.

This case presents a question of great national importance that calls out for prompt review. The Fourth Circuit has effectively invalidated a major provision of the Americans with Disabilities Act (ADA), and that decision is certain to have far-reaching and highly controversial effects. The ADA provides that "transvestism," "transsexualism," "gender identity disorders not resulting from physical impairments," and "other sexual behavior disorders" are not "'disabilit[ies]'" within the meaning of its terms. 42 U. S. C. §12211(b). Nevertheless, the Fourth Circuit held that because "gender identity disorder" is a "now-obsolete" term in the field of psychiatry, that statutory category "*no longer exists*" and has therefore ceased to have any effect. 45 F. 4th 759, 768–769, and n. 5 (2022) (emphasis in original). As a result, all entities covered by the ADA must make "accommodations" for any "feeling[s] of stress and discomfort" that result from a person's "assigned sex." *Id.*, at 768 (internal quotation marks omitted); see, *e.g.*, §§12112(b)(5)(A), 12182(b)(2)(A)(ii).

This decision will raise a host of important and sensitive questions regarding such matters as participation in women's and girls' sports, access to single-sex restrooms and housing, the use of traditional pronouns, and the ad-

ministration of sex reassignment therapy (both the perfor-
mance of surgery and the administration of hormones) by
physicians and at hospitals that object to such treatment on
religious or moral grounds.

If the Fourth Circuit's decision is correct, there should be
no delay in providing the protection of the ADA to all Amer-
icans who suffer from "feeling[s] of stress and discomfort"
resulting from their "assigned sex." But if the Fourth Cir-
cuit's decision is wrong—and there is certainly a reasonable
argument to that effect—then the 32 million residents of
the Fourth Circuit should not have to bear the conse-
quences while other courts wrestle with the same legal is-
sue.

There are times when it is prudent for this Court to deny
review of a questionable court of appeals decision because
we may learn from the way in which other courts of appeals
and district courts handle the same question, but in this
case that prudential consideration is not sufficient to justify
the denial of prompt review. The majority and dissenting
opinions below lay out the opposing arguments, and if we
granted review, we would undoubtedly receive thorough
briefing from the parties and in *amicus* briefs filed by ex-
perts and other interested parties, including in all likeli-
hood the Federal Government. Under these circumstances,
in my judgment, there is no good reason for delay.

## I

The ADA was landmark legislation that resulted from a
bipartisan effort to "eliminate unwarranted discrimination
against disabled individuals in order both to guarantee
those individuals equal opportunity and to provide the Na-
tion with the benefit of their consequently increased
productivity." *Cleveland* v. *Policy Management Systems
Corp.*, 526 U. S. 795, 801 (1999). In light of its bold ambi-
tions, the ADA sweeps across nearly every facet of public
life. It binds all employers of meaningful size and demands

that they refrain from various forms of discrimination and, in certain circumstances, requires that they offer needed accommodations. 42 U. S. C. §§12111(5), 12112(a), (b). It requires all state and local government entities to ensure that no one is "excluded from participation in or . . . denied the benefits of" public programs and services "by reason of [a] disability." §12132. It requires a wide variety of private entities, including numerous businesses and private schools, to ensure that persons with disabilities receive "the full and equal enjoyment" of those entities' "goods, services, facilities, privileges, advantages, [and] accommodations" in a variety of ways. §§12181(7), 12182.

The ADA is far-reaching, but like all other statutes, it has its limits. It expressly excludes coverage for a disparate group of traits, habits, and mental conditions, including sexual orientation, conditions arising from drug use, and gambling addiction. §12211. And relevant here, the ADA also excludes mental dispositions and conditions that relate to gender expression or gender identity. See §12211(b)(1) (referring to "transvestism, transsexualism, . . . gender identity disorders not resulting from physical impairments, or other sexual behavior disorders"); accord, §12208.

In this case, the plaintiff, Kesha Williams, brought suit against Stacey Kincaid, the sheriff of Fairfax County, Virginia, based on alleged mistreatment during a stay in a county detention center. Some of Williams's claims arose under state tort law–for example, a gross negligence claim based on injuries allegedly inflicted during a body search–and Kincaid does not ask us to consider any of those claims. Rather, she contends only that she cannot be sued under the ADA for failing to accommodate Williams's "gender dysphoria," by, among other things, placing Williams in men's housing, failing to offer hormone therapy, and permitting "persistent and intentional misgendering and harassment." 45 F. 4th, at 763.

The Fourth Circuit panel majority found that Williams

had pleaded a covered disability, notwithstanding the exclusions noted above, and it relied on two separate rationales.

*First*, the majority found that the condition alleged by Williams, *i.e.*, "gender dysphoria," does not constitute what the ADA calls a "gender identity disorder." The panel majority concluded that the term "gender identity disorders" in the ADA refers *only* to a so-named psychological condition that was used in the American Psychiatric Association's Diagnostic and Statistical Manual at the time of the ADA's enactment, and because leading organizations in that field no longer recognize that concept, the panel majority held that the term is now "obsolete." *Id.*, at 769. In the panel majority's view, the concept of gender identity disorder encompassed all "cross-gender identification," while the now-accepted concept of "gender dysphoria" is defined by stress that goes beyond "being trans alone." *Id.*, at 768–769 (internal quotation marks omitted). As a result, the panel majority reasoned that "gender identity disorder" as a category "*no longer exists*," and thus the statutory exclusion is without any effect. *Id.*, at 769, n. 5 (emphasis in original).

*Second*, the majority found that Williams had adequately pleaded an ADA claim by alleging gender dysphoria resulting from a physical impairment. As noted, the ADA's definition of disability excludes "gender identity disorders not resulting from physical impairments," §12211(b)(1), and therefore, if a person's "gender dysphoria" results from a physical impairment, that condition may qualify as a disability. The ground on which the majority concluded that Williams's complaint sufficiently alleged a physical impairment is not entirely clear, but the majority's reasoning appears to be that Williams has a physical need for hormonal treatment because, without it, Williams experiences "'physical distress.'" 45 F. 4th, at 771 (emphasis deleted). In addition, the majority noted "medical and scientific research identifying possible physical bases of gender dysphoria."

*Ibid.*

The panel majority sought to bolster its interpretation of the ADA by invoking the doctrine of constitutional avoidance. The majority argued that even if the ADA's text did not *require* this interpretation, it would nevertheless be necessary in order "to avoid a serious constitutional question" under the Equal Protection Clause. *Id.*, at 772. Citing Circuit precedent, the majority found that "the ADA's exclusion of 'gender identity disorders'" from the definition of disability was "evidence of . . . discriminatory animus" by Congress, and to support this conclusion, the majority pointed to "moral judgment[s]" expressed by legislators who backed the exclusion for "gender identity disorders." *Id.*, at 773.

This ground-breaking interpretation of the ADA is remarkable in itself, but the Fourth Circuit panel majority went even further and noted that its reasoning applied equally to Williams's claim under the Rehabilitation Act of 1973, which extends disability-accommodation requirements to a different set of entities that benefit from various forms of federal financial assistance. 45 F. 4th, at 765, n. 1; see 29 U. S. C. §794.

Judge Quattlebaum dissented in relevant part, and set out a reasonable contrary argument. Looking to the diagnostic criteria for gender identity disorder in 1990, he concluded that "when the ADA was signed into law, gender identity disorder was understood to include what Williams alleges to be gender dysphoria," that is, "distress and discomfort from identifying as a gender different from the gender assigned at birth." 45 F. 4th, at 782–783. He also argued that the majority's interpretation of the ADA provision excluding gender-identity conditions causes that provision to nullify itself. His understanding of the claim that the majority accepted was that gender dysphoria results from a physical impairment whenever a person has the "physical characteristics" of a gender with which that

person does not identify and suffers distress and discomfort as a result. *Id.*, at 788. But that interpretation, he wrote, "would read 'not resulting from physical impairments' out of the statute." *Ibid.*

By a narrow 8-to-6 vote, the Fourth Circuit denied en banc review. 50 F. 4th 429 (2022).

## II

Without full briefing and argument, I would not take a firm view on the proper interpretation of the ADA, let alone on the merits of Williams's particular case. But several aspects of the Fourth Circuit's reasoning are troubling.

First, as Judge Quattlebaum noted in dissent, *both* gender identity disorder and gender dysphoria have long been identified by "'persistent or recurrent discomfort'" in connection with "'one's assigned sex.'" 45 F. 4th, at 782 (quoting American Psychiatric Assn., Diagnostic and Statistical Manual of Mental Disorders 77 (rev. 3d ed. 1987)). So the change in the field's terminology does not obviously place gender dysphoria outside the category of gender identity disorders. But even setting aside Judge Quattlebaum's important point, the Fourth Circuit's narrow focus on the phrase "gender dysphoria" does not engage with the broad brush used by Congress, which barred application of the ADA not only to "transsexualism" and "gender identity disorders not resulting from physical impairments," but also to "*other sexual behavior disorders*." §12211(b)(1) (emphasis added). This final catch-all category suggests that Congress sought to prohibit the ADA's application to conditions that are sufficiently similar to the more specific categories of conditions that precede. At a minimum, the Fourth Circuit should have explained why the catch-all provision was insufficient to encompass gender dysphoria.

Second, the Fourth Circuit's understanding of when a gender identity disorder "result[s] from physical impair-

ments" does not meaningfully distinguish physical impairments from "mental impairment[s]," which the ADA recognizes as a distinct category. §§12102(1)(A), 12211(b)(1). Many common mental impairments, such as depression and anxiety disorders, cause real and sometimes powerful physical distress and are treated by chemical interventions. That does not mean, however, that those mental impairments are caused by an independent physical trait that *itself* qualifies as an impairment.[1] Significantly more analysis would be needed to accept an interpretation of the exception to the exclusion that swallows the exclusion whole.

Finally, the Fourth Circuit's animus analysis relies too heavily on statements made by a few Members of Congress and does not sufficiently take into account the many considerations that Congress may have had in mind in adopting a piece of major legislation like the ADA. A legislative body "need not address all aspects of a problem in one fell swoop; policymakers may focus on their most pressing concerns." Williams-Yulee v. Florida Bar, 575 U. S. 433, 449 (2015). Congress may also have thought that coverage of gender-identity-related conditions would raise special free speech and free exercise concerns. It seems more than uncharitable to say, as the Fourth Circuit did, that "[t]he only reason we can glean" for excluding gender identity disorders is "'a bare . . . desire to harm a politically unpopular group.'" 45 F. 4th, at 773.

## III

The potential impact of the Fourth Circuit's decision is difficult to overstate. Consider, first, the claims that the

_____

[1] The Fourth Circuit's reasoning is also unneeded to give meaning to the "physical impairments" exception, as gender identity disorders *do* arise in connection with physical traits that clearly qualify as independent impairments. See 45 F. 4th 759, 788, n. 7 (2022) (Quattlebaum, J., dissenting) (discussing "'physical intersexuality'" of the sex organs).

panel majority allowed to go forward in this particular case.
Those claims sought relief for the distress caused by sex-
specific housing, the failure to provide or facilitate hormone
treatment, and the use in relation to Williams of the pro-
noun "he," forms of address like "mister" and "sir," and the
term "gentleman." *Id.*, at 764 (internal quotation marks
omitted). Permitting such claims suggests numerous fur-
ther consequences. If the ADA requires that a person be
given access to facilities reserved for the sex with which
that person identifies whenever that is needed to avoid sub-
stantial distress, then such a claim may be brought against
any "place of lodging," "service establishment," "elemen-
tary, secondary, undergraduate, or postgraduate private
school," or "homeless shelter" with sex-specific bathrooms
or dormitories. See §§12181(7)(A), (F), (J), (K).[2] Educa-
tional institutions that sponsor girls' or women's athletic
competitions, and facilities that host such events, may be
sued if they exclude any individual who identifies as female.
§§12181(7)(C), (J), (L), 12182(b)(1)(A)(iii). If the ADA al-
lows a cause of action for not facilitating hormone treat-
ment, an ADA claim may presumably be filed against any
"hospital" or "health care provider" that declines to provide
hormone treatment or surgical procedures as part of a pro-
cess of gender transition, at least where it would provide
such hormones or similar surgery for other medical reasons.
§12181(7)(F). If the ADA allows a cause of action against
an institution whose employees decline to refer to a co-
worker using the pronoun or form of address that this co-
worker prefers, then any of the above institutions or any
other (broadly defined) place of public accommodation is put

———————

[2] Of course, the uniquely dangerous context of prison presents dangers
well beyond personal distress, and such dangers may trigger numerous
legal obligations apart from the ADA. In light of the possibility that Wil-
liams was actually endangered by being housed with men, the Fourth
Circuit allowed a state tort claim to proceed; that holding is not chal-
lenged, and I do not question it here.

to the choice between, on the one hand, firing all employees who refuse (perhaps for religious reasons) to speak contrary to their beliefs on gender transition or, on the other hand, risking ruinous lawsuits.

In short, the Fourth Circuit's ruling leaves a great many people and institutions under the looming threat of liability, forcing them to change their behavior—behavior that may be deeply rooted in moral or religious principles—or face an unending stream of lawsuits. If it is at least *possible* that the ADA does not require these results, we should be willing to resolve the question now rather than later.

*        *        *

The Fourth Circuit's decision makes an important provision of a federal law inoperative and, given the broad reach of the ADA and the Rehabilitation Act, will have far-reaching and important effects across much of civil society in that Circuit. Voters in the affected States and the legislators they elect will lose the authority to decide how best to address the needs of transgender persons in single-sex facilities, dormitory housing, college sports, and the like. Given that impact, and with the legal issues well aired below and in a variety of prior federal court decisions, I would grant certiorari now.[3] Because the Court declines to do so, I respectfully dissent.

_____

[3] See, *e.g., Parker* v. *Strawser Constr., Inc.*, 307 F. Supp. 3d 744, 754 (SD Ohio 2018) (surveying case law as of 2018 and concluding that "[t]he majority of federal cases have concluded" that the ADA excludes even those gender identity disorders that "substantially limit a major life activity").